IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2024

IN RE DILMER S.M., ET AL.[1]

**Appeal from the Juvenile Court for Shelby County**
**No. FF1629    Tarik B. Sugarmon, Judge**

_____

**No. W2024-00632-COA-R3-PT**

_____

A mother appeals from an order terminating her parental rights to her four minor children. The trial court held that the evidence presented supported termination of the mother's rights based on the statutory ground of severe child abuse. The court also found that termination was in the children's best interests. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., joined. JEFFREY USMAN, J., filed a separate concurring opinion.

Laurie Winstead Hall, Memphis, Tennessee, for the appellant, Maria S.M.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

David John Kreher, Cordova, Tennessee, guardian *ad litem*.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. BACKGROUND

This appeal concerns Dilmer S.M., Elida M.S., Franklin M.S., and Ervin M.S. ("the children") who were born to Maria S.M. ("Mother") and Efrain M.G. ("Father") in 2013, 2015, 2016, and 2017, respectively. Father did not appeal from the order terminating his parental rights to the children. In May 2023, Mother was arrested on the charges of first degree murder and aggravated child abuse of the children's cousin, Ervin Leonard. Ervin Leonard was Mother's nephew. He was fourteen months when he passed away. Mother's criminal charges relating to Ervin Leonard's death are pending. Additionally, Mother must resolve pending legal issues related to her immigration status.

On September 28, 2019, the Tennessee Department of Children's Services ("DCS") responded to a referral that Ervin Leonard was found deceased in Mother's and Father's home. His body was bruised, his head swollen, and his arm appeared broken. Mother and Father disclosed to authorities that Ervin Leonard was entrusted to their care because his own mother was deported from the United States. Mother and Father further explained that they had been Ervin Leonard's sole caretakers over the past several months and that he did not attend daycare. According to Mother and Father, Ervin Leonard fell from his crib onto a tile floor.

DCS removed the children from Mother's and Father's home. The Juvenile Court of Shelby County ("trial court") granted temporary legal custody of the children to DCS. DCS placed the children in David G.'s foster home where they have lived ever since. Due to apparent trauma, Ervin Leonard's death was immediately investigated as a homicide. The medical examiner determined that Ervin Leonard's cause of death was blunt force injuries of the head, and ruled the manner of death as homicide. Ervin Leonard's autopsy report specified:

> Autopsy showed multiple blunt force injuries of the head and neck, torso and extremities, with lethal injuries of the head. Externally, the head and face showed multiple bruises in various stages of healing. There was scalp tissue hemorrhage with extensive fibrosis indicating a passage of time since some of the skull fractures. The skull fractures were in various stages of healing. The brain had extensive bleeding including subarachnoid hemorrhage of the basilar aspect of the brain and bleeding in the subdural space around the optic nerve sheath; of note, the insertion of the optic nerve sheath dura into the sclera of the left eye (peripapillary region) showed focal intrascleral hemorrhage, which is due to rupture of vessels of the circle of Zinn-Haller and highly specific for non- accidental trauma. There was extensive bleeding of the spinal cord including epidural, subdural, and

subarachnoid hemorrhage. The maxillary frenulum was torn, which is commonly seen in non-accidental trauma.

There were multiple rib fractures in various stages of healing and a right humerus fracture. The torso also showed internal injuries including a left side retroperitoneal hematoma, left perinephric hematoma, peripancreatic hemorrhage, and a hematoma of the mesentery of the small bowel. Taken all together, these findings represent extensive evidence of non- accidental injuries.

On September 30, 2019, DCS petitioned the trial court to adjudicate the children dependent and neglected. Following an October 13, 2021, hearing in which each parent was represented by counsel, the trial court adjudicated the children dependent and neglected by order entered November 24, 2021. In the dependency and neglect order, the trial court found that:

Ervin Leonard had twenty seven external and internal injuries. . . . Dilmer disclosed in a forensic interview that he saw his parents slapping, shaking, and hitting the deceased with a belt. Dilmer also disclosed that his father hit him as well. The Court finds Dilmer's statements credible. The Court finds that [Mother] and [Father] plead their 5th Amendment right and refused to answer the question of whether they caused any injury to the deceased child[.] The Court finds a negative inference. The Court finds [Mother's] and [Father's] explanations for the injury to Ervin [Leonard] or their efforts to attempt medical care not credible. . . . The Court finds [Mother] and [Father] as the perpetrators of severe abuse. . . . [DCS] is relieved of reasonable efforts in working with [Mother] and [Father].

The November 24, 2021, order concluded that Mother and Father perpetrated severe abuse, "pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(a)(i) for the knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death based on the testimony from [DCS], and the Exhibits entered by [DCS]." As the trial court referenced in its dependency and neglect findings, the record contains a report of a forensic interview of Dilmer taken October 2, 2019. It states:

Dilmer [S.M.] disclosed he witnessed dad hitting the baby on his face with an open hand and his fist more than once. His dad hit the baby so hard, the baby['s] tooth broke. Dilmer also stated his dad hit the baby with a belt on his belly. Dilmer stated the baby was crying. His mom witnessed his dad hitting the baby. (Note: child stated his dad has hit him like that too). Throughout this interview, Dilmer used English and Spanish. Sometimes it

appeared he didn't understand either language b/c he wouldn't answer the questions that were asked . . . he just looked around the room. Dilmer told the interviewer blood was on the baby's head while he was in the crib. He stated his mom wiped the blood off with some paper…baby was dead. Dad took the baby to the police.

On March 4, 2022, DCS petitioned the trial court to terminate each parent's rights to each child, alleging several statutory grounds. DCS further alleged that termination would serve the children's best interests. The case proceeded to trial on March 21, 2024. Upon DCS's motion, the trial court dismissed certain grounds alleged in the petition. DCS proceeded to present evidence on the grounds of severe child abuse and failure to manifest an ability and willingness to assume custody or financial responsibility, Tennessee Code Annotated sections 36-1-113(g)(4); (g)(14). The following witnesses testified: DCS family service workers Lisa Collins and Charlie Parker; Foster Father, David G.; Mother; and Father. At the time of trial, Mother was incarcerated. The parents' primary language is Mam, so a Mam interpreter assisted throughout the trial. A guardian *ad litem* represented the children. By then, Dilmer was ten years old, Elida was eight years old, Franklin was seven years old, and Ervin was six years old.

Ms. Collins and Ms. Parker testified that the children seem well-adjusted to and happy in the foster home, and that they never ask about Mother and Father. Mother's counsel asserted the Fifth Amendment privilege against self-incrimination on Mother's behalf in response to the following questions:

> "What happened the night [Ervin Leonard] died in your home?"
> "Did you harm [Ervin Leonard]?"
> "Did [Father] harm [Ervin Leonard]?"; and
> "Was there domestic violence between you and [Father]?"

At trial, Foster Father testified that the children were "pretty fierce" and displayed "very violent tempers" when they came to live in his home in 2019. Since then, the children's behaviors "completely changed." The children speak English. Foster Father recalled that six months after placement Elida, unsolicited, stated, "Momma choked the baby." This prompted the other children to begin talking "and it became emotional." The children "wanted to talk about it in pieces" and in graphic detail. The children disclosed to Foster Father that Ervin Leonard was crying and that Mother had shaken and choked him. The children also disclosed that Ervin Leonard was dunked into a bathtub of water, but it was unclear to Foster Father whether he was alive at that point. Foster Father stated that "[m]ost of the talk was centered on Mother." After recounting these memories, the children suffered from nightmares, but the family worked through it together.

Foster Father testified that the children do not otherwise mention Mother and Father. Prior to her incarceration, Mother visited the children monthly, under supervision. During

visits, Mother and the children had "minimal" interactions. Foster Father was present during the visits. Typically, the children sought to play games on Mother's phone, and she would allow them to do so until the visit ended. Foster Father tried to encourage the children to sit with Mother without playing on her phone, and she tried to engage with them as well. The children would approach Mother for a moment before walking away. Foster Father took this to mean the children did not know Mother. Three or four years before trial, Dilmer spontaneously began calling Foster Father "dad," "dada," or "papa." The other children followed suit. Foster Father reported that all of the children were honor roll students who earn "all types of awards for grades." He professed his desire to adopt the children if they became eligible for adoption.

By final order entered April 11, 2024, the trial court found that the limited proof presented at trial about the alleged termination ground of failure to manifest an ability and willingness to assume custody or financial responsibility, Tennessee Code Annotated section 36-1-113(g)(14), did not sustain the allegation by clear and convincing evidence. However, the trial court found that the evidence clearly and convincingly established the ground of severe child abuse, Tennessee Code Annotated section 36-1-113(g)(4):

> Pursuant to T.C.A. § 36-1-113(g)(4) and as defined in T.C.A. § 37-1-102(b)(27), Respondents [Father] and [Mother] have committed severe child abuse against Ervin Leonard [S.M.], a child. During the children's dependency case, this Court found on October 13, 2021, [the dependency and neglect hearing date,] that severe child abuse of Ervin Leonard had been found by clear and convincing evidence with [Mother] and [Father] as the perpetrators of the abuse. The final severe abuse order was entered into evidence in this matter. . . . This Court is required to give credence to that order and cannot ignore its findings as it is a final order on the subject of severe child abuse.

Additionally, the trial court determined that termination of each parent's rights was in the children's best interests. Mother appealed. Father did not.

## II.    ISSUES

We restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the trial court's finding of the statutory ground for termination.

B.    Whether clear and convincing evidence supports the trial court's findings that termination of Mother's parental rights was in the best interests of the children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(l)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83

S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2023, the Tennessee Supreme Court provided the following guidance to this court in reviewing cases involving the termination of parental rights:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary.
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness.

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023) (internal citations omitted).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995)); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).

## IV.    DISCUSSION[2]

### A.

As stated above, the trial court granted the termination petition against Mother based upon the statutory ground of severe child abuse. Our Supreme Court has instructed that

---

[2] We will reference the statutes which were in effect when DCS filed the petition for termination of parental rights on March 4, 2022.

we "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016). However, this Court has not interpreted the instruction "to mean that this Court must also review grounds that the trial court found were not sufficiently proven when the party who sought termination does not challenge that ruling on appeal." *In Re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *3 (Tenn. Ct. App. Apr. 29, 2020)). Accordingly, we will not review the trial court's determination that the statutory ground of failure to manifest an ability or willingness to assume custody of or financial responsibility for the children was not proven by clear and convincing evidence because DCS does not challenge this finding on appeal.

*Severe Child Abuse*

Tennessee Code Annotated section 36-1-113(g)(4) provides:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child[.]

As relevant here, section 37-1-102(27) defines "Severe child abuse" as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]

On appeal, Mother contends that DCS did not properly allege the ground of severe abuse against her in the petition to terminate parental rights. She admits that she did not raise this argument in the trial court. Upon review of the petition, we clearly see the following allegation:

**SEVERE CHILD ABUSE**

> 20. Respondents [Mother] and [Father] have committed severe child abuse as defined by Tennessee Code Annotated section 37-1-102 against the children named in this Petition and therefore their parental rights should be terminated pursuant to section 36-1-113(g)(4).

We hold that the March 4, 2022, petition to terminate parental rights afforded Mother explicit and proper pre-trial notice that DCS sought to terminate her rights on the ground

of severe child abuse.

As detailed above, on November 24, 2021, the trial court entered an order adjudicating the children dependent and neglected and finding that their deceased cousin, Ervin Leonard, was the victim of severe child abuse perpetrated by Mother under section 37-1-102(b)(27). The court's explicit factual findings within the November 24 order are about Ervin Leonard, Mother's and Father's positions as sole caregivers of Ervin Leonard, Ervin Leonard's many injuries and subsequent death, Dilmer's disclosure that he saw Mother and Father slapping, shaking, and hitting Ervin Leonard with a belt, and the court's negative inference following each parent's assertion of his or her Fifth Amendment privilege when questioned about Ervin Leonard's injuries. This order was final and Mother did not appeal it. The order was admitted without objection as an exhibit during the termination trial. Therefore, the severe abuse finding is *res judicata*. *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). We apply the doctrine of *res judicata* "to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding ha[s] been made in a previous dependency and neglect action." *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010). Because the severe abuse finding against Mother in the November 24, 2021, order satisfies the "under any prior order of a court" language in Tennessee Code Annotated section 36-1-113(g)(4), we conclude the trial court properly determined that DCS proved this ground for termination by clear and convincing evidence. Accordingly, we affirm.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, the trial court was required to consider whether termination of Mother's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id*. Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id*. The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id*.

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render

the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In considering all of the statutory factors from the children's perspectives, the trial court highlighted various factors in favor of termination. The court noted the children's ages when they entered the foster home, their ages at trial, and "the children's critical need for stability and continuity of placement throughout their minority to be met." Tenn. Code Ann. § 36-1-113(i)(1)(A). The court found that, because the children had bonded with their Foster Father over the previous four years, to remove them from his home would negatively affect their emotional and psychological well-being. Tenn. Code Ann. § 36-1-113(i)(1)(B), (H). The court considered the unrebutted evidence that the children lack an attachment to Mother and questioned whether such an attachment could ever exist given the abuse that took place in Mother's home. Tenn. Code Ann. § 36-1-113(i)(1)(D). Pursuant to sections 36-1-113(i)(1)(F) and (G), the trial court inferred, based on the graphic disclosures they made about Mother to Foster Father, that the children were fearful of her, and that any future contact with her would likely trigger fear, trauma, or post-traumatic stress symptoms. The court found that Mother was incarcerated with no release date in sight, so she had not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the children to be in her care. Tenn. Code Ann. § 36-1-113(i)(1)(J). The trial court determined that the proof of Mother's brutality against a child clearly weighed in favor of termination. Tenn. Code Ann. § 36-1-113(i)(1)(N). Finally, although noting that there was no explicit testimony about Mother's mental and emotional health, the court reasoned that the fact that a child died in her home "by being brutally beaten over a period of time, that there were new and old injuries, clearly shows that it would be detrimental to the children to be around [Mother]." Tenn. Code Ann. § 36-1-113(i)(1)(T).

Mother does not challenge the trial court's best interest findings on appeal. The trial court considered all of the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination by clear and convincing evidence. Upon careful review of the record, we agree. We conclude that clear and convincing evidence in the record supports the determination that it was in the children's best interests for Mother's parental rights to be terminated.

## V.    CONCLUSION

The trial court's judgment is affirmed. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellant, Maria S.M.

_____
JOHN W. McCLARTY, JUDGE